No. 25-3434

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

_____

IN RE HAGENS BERMAN SOBOL SHAPIRO LLP
and STEVE W. BERMAN,
*Petitioners*

_____

**On Petition for Writ of Mandamus to the
U.S. District Court for the Eastern District of Pennsylvania**
Hon. Paul S. Diamond, United States District Judge
No. 2:11-cv-05782 PD (E.D. Pa.)
AND ALL RELATED CASES

_____

**PETITION FOR PANEL REHEARING
OR FOR REHEARING *EN BANC***

Christopher C. Conner (PA I.D. 36407)
Stefanie Pitcavage Mekilo (PA I.D. 312720)
SAXTON & STUMP
4250 Crums Mill Road, Suite 201
Harrisburg, PA 17112
Telephone: (717) 216-5522
cconner@saxtonstump.com
smekilo@saxtonstump.com

Gaetan J. Alfano (PA I.D. 32971)
Peter St. Tienne Wolff (PA I.D. 208433)
PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI LLP
1818 Market Street, Suite 3402
Philadelphia, PA 19102

Telephone: (215) 320-6200
gja@pietragallo.com PSW@pietragallo.com

Keith Beauchamp (AZ I.D. 12434)
Malvika A. Sinha (AZ I.D.038046)
COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue, Suite 1900
Phoenix, AZ 85004
Telephone: (602) 381-5490
kbeauchamp@cblawyers.com
msinha@cblawyers.com

*Attorneys for Petitioners*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................... i

TABLE OF AUTHORITIES .............................................................. ii

L.A.R. 35.1 STATEMENT OF COUNSEL .......................................... iii

INTRODUCTION ............................................................................1

BACKGROUND ..............................................................................2

ARGUMENT ...................................................................................5

   I.    Rehearing is necessary because this matter involves questions of exceptional importance. ......................................................................................5

      A.   Whether a judge's *sua sponte* public referral of civil counsel for criminal investigation after counsel seeks his recusal demonstrates bias warranting recusal?....................................................................................6

      B.   Whether a judge's extensive, unauthorized *ex parte* communication with a special discovery master creates an appearance of bias warranting recusal?...11

   II.   The importance of these questions extends beyond Petitioners and the case at bar. ...................................................................................................15

CONCLUSION ..............................................................................16

CERTIFICATES OF COMPLIANCE................................................19

CERTIFICATE OF SERVICE ..........................................................20

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Ford Motor Co.*, 653 F.3d 299 (3d Cir. 2011) ..........................................8

*Comuso v. Nat'l R.R. Passenger Corp.*, 267 F.3d 331 (3d Cir. 2001) ....................8

*Donziger v. United States*, 598 U.S. ----, 143 S. Ct. 868 (2023) ...........................15

*Eash v. Riggins Trucking, Inc.*, 757 F.2d 557 (3d Cir. 1985)..................................8

*Haines v. Liggett Group Inc.*, 975 F.2d 81 (3d Cir. 1992) ......................................6

*In re Kensington Int'l, Ltd.*, 368 F.3d 289 (3d Cir. 2004) .......................................6

*In re Murchison*, 349 U.S. 133 (1955).....................................................................6

*In re Tutu Wells Contamination Litig.*, 120 F.3d 368 (3d Cir. 1997).......................8

*In re United States*, 441 F.3d 44 (1st Cir. 2006)....................................................15

*In re: Terrorist Attacks on September 11, 2001*, No. 03-MDL-1570, 2023 WL 4561766 (S.D.N.Y. July 17, 2023)................................................................9

*Johnson v. SmithKline Beecham Corp.*, 2:11-cv-05782-PD................................13

*Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980)......................................................6

*Martinez v. Winner*, 771 F.2d 424, 435 (10th Cir. 1985) .....................................5, 9

*O.R. v. Hutner*, 515 F. App'x 85 (3d Cir. 2013) ....................................................8

*Simmerman v. Corino*, 27 F.3d 58 (3d Cir. 1994) ..................................................8

*United States v. Cross*, 128 F.3d 145 (3d Cir. 1997)..............................................5

*United States v. Donziger*, 38 F.4th 290 (2d Cir. 2022) .......................................10

**Statutes**

28 U.S.C. § 455 .........................................................................................................6

**Other Authorities**

Code of Conduct for U.S. Judges, Canon 3 ..................................................... 11, 12

**Rules**

Fed. R. Civ. P. 53 ....................................................................................... 11, 12, 13, 14

## **L.A.R. 35.1 STATEMENT OF COUNSEL**

I, Christopher C. Conner, Esquire, express the belief based upon a reasoned and studied professional judgment that this Petition involves two questions of exceptional importance and first impression, i.e., (1) whether a presiding judge's public referral of counsel to the United States Department of Justice ("DOJ") for criminal investigation, shortly after counsel sought his recusal in a pending civil case, demonstrates actual bias or creates the appearance of bias when the stated basis for the referral is a special master report issued more than two years earlier; and (2) whether extensive and unauthorized *ex parte* communications between a presiding judge and a special master preceding the special master's *sua sponte* recommendation of civil sanctions create an appearance of bias such that a different judge should undertake the requisite *de novo* review of that sanctions recommendation.

# **INTRODUCTION**

This appeal raises fundamental questions of fairness, justice, and the importance of judicial impartiality *and* its appearance. Petitioners[1] filed a motion for recusal based on the district court's extensive and improper *ex parte* communications with a Special Discovery Master during the Master's preparation of a report that, *sua sponte*, recommended imposition of civil sanctions on counsel. The court responded not by addressing the concerns raised about its impartiality, but by publicly announcing its referral of counsel to the DOJ for criminal investigation into alleged conduct set forth in the report, which had at that point been before the court for more than two years. Two days later, the court denied the recusal motion without meaningfully addressing its allegations. It is against this backdrop that Petitioners were compelled to seek mandamus relief, to safeguard their professional reputations and constitutional rights and, most importantly, vindicate their clients' rights to a fair trial.

By any reckoning, the district court's actions are highly unusual. At the very least they beg many questions: How and when should a judge respond if he suspects counsel of record has engaged in criminal activity? May a judge *sua sponte* announce his suspicions in a public document and avail himself of the investigative

---

[1] Petitioners are the law firm of Hagens, Berman, Sobol, Shapiro LLP (the "Firm"), and Steve M. Berman, Esquire.

powers of the Executive branch to explore them?  And at the heart of the matter: when a judge publicly and gratuitously announces his view that counsel of record has committed some unspecified crime, how could that counsel's client expect to receive the fair trial to which they are entitled?

The Panel's summary denial of the Petition without reasoning leaves these important questions unanswered.  This Court should not permit them to remain so. On one hand, even assuming it was appropriate for the district court to publicly refer Petitioners for criminal investigation only after its impartiality had been questioned, such a consequential measure must surely be subject to the strictest guardrails. Likewise, even if the referral does not reflect actual or apparent bias, that conclusion is hardly intuitive and Petitioners (and their clients, the bar, and the public writ large) would benefit from an explanation.  On the other hand, if the Panel has erred as Petitioners submit, the district court has denied Petitioners' clients their right to a fair trial.  Either way, the Petition warrants careful rehearing by the Panel or by this Court *en banc* and a written opinion addressing the issues of first impression it raises.

## **BACKGROUND**

In 2014, in the underlying proceeding, the district court appointed Special Discovery Master ("SDM") Hangley and issued the initial appointment order, identifying duties and authorizing *ex parte* communications between the court and SDM Hangley in just three discrete circumstances: (1) "concerning procedural

matters," (2) "to assist the Court's understanding of complex discovery matters," and (3) "for any other reason reasonably necessary to fulfillment of his duties." (Appx191).  Fact discovery closed in November 2014, after which the court imposed a stay of other deadlines and, over the next four years, referred various matters to SDM Hangley.  Between 2017 and 2021, SDM Hangley presided over hearings principally related to Petitioners' motions to withdraw as counsel to five plaintiffs. In the 28 months following the final hearing, SDM Hangley engaged in no further fact-finding, held no hearings, and sought no additional information from the parties.

On October 12, 2023, SDM Hangley issued a report (the "R&R") in which he recommended that the court impose unspecified civil sanctions on Petitioners. (Appx1).  In the 154-page R&R, SDM Hangley did not limit himself to the motions to withdraw that he was appointed to resolve and instead *sua sponte* recommended that the court sanction Petitioners for alleged conduct that occurred over a decade prior.  SDM Hangley did not even constrain his purported "findings" to the case at bar, offering vitriolic and unfounded speculation about the Firm's culture, which he gratuitously described as "avarice in the raiment of messianic zeal."  (Appx156).

Petitioners filed a voluminous Objection refuting SDM Hangley's understanding of the facts.  (Appx 254).  Petitioners also raised concerns about the court's ability to conduct a *de novo* review of the R&R given its extensive *ex parte* communications with SDM Hangley while the R&R was being prepared.  (*Id.*)

On August 5, 2025, the court issued an Order to Show Cause and related Opinion, summarily adopting SDM Hangley's findings but declining to rule on his sanctions recommendation. (Appx160). The Order and Opinion were a troubling harbinger of what was yet to come. Despite Petitioners having lodged sweeping objections to the R&R, the court inaccurately described the "great majority" of SDM Hangley's findings as being "undisputed." (*Id.*) Even more problematic, the court declined to meaningfully address Petitioners' concerns regarding the *ex parte* communications with SDM Hangley regarding the very same R&R, instead accusing Petitioners of objecting in bad faith because they had paid SDM Hangley's invoices without raising their concern. (Appx175-177).

Petitioners timely filed their response, in which they corrected the record, distinguished the legal authorities underpinning the sanctions recommendation, and rebutted the accusation that they had acted in bad faith. *See* (Appx1115-1117; Appx182-183). Petitioners also promptly filed their Motion for Recusal, given the court's failure to address the impartiality concerns raised in their Objection. The Motion highlighted, among other things, that SDM Hangley had engaged in nearly two dozen *ex parte* communications with the court before issuing the 2023 R&R, at a time when his sole focus would have been (and could only have been) the R&R. As detailed in Petitioners' Motion, SDM Hangley's invoices—viewed in a different light after SDM Hangley issued his *sua sponte* and *ultra vires* sanctions

recommendation—reveal multiple time entries which link SDM Hangley's communications with the court directly to research, drafting, and other preparation of the R&R.  No represented party opposed the Motion.

On December 2, 2025, less than three weeks after the Motion became ripe, the court issued a memorandum opinion (the "Criminal Referral), writing:

> Because the civil discovery process limited him, Mr. Hangley's investigation and findings, damning as they are, appear to be only partial.  Because his findings more than warrant further investigation, I have referred this matter to the Department of Justice. See Martinez v. Winner, 771 F.2d 424, 435 (10th Cir. 1985) ("[A judge has] a duty to notify the proper authorities if he felt a crime was being committed in his courtroom.").

(Appx183).  Predictably, extensive publicity followed.

Two days later, the court denied the Motion for Recusal.  (Appx186).  As with the August 2025 Order to Show Cause and Opinion, the court conspicuously elected not to clarify the subjects of the *ex parte* communications.

## ARGUMENT

### I.    Rehearing is necessary because this matter involves questions of exceptional importance.

The Petition for Mandamus raises issues of paramount importance: a litigant's constitutional right to a fair trial, and counsel's right to due process before imposition of sanctions.  "A fair trial in a fair tribunal is a basic requirement of due process." *United States v. Cross*, 128 F.3d 145, 148 (3d Cir. 1997) (while fairness "requires an absence of actual bias in the trial of cases," "our system of law has always

endeavored to prevent even the probability of unfairness") (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). "The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

Accordingly, "[i]mpartiality and the appearance of impartiality in a judicial officer are the *sine qua non* of the American Legal System." *Haines v. Liggett Group Inc.*, 975 F.2d 81, 98 (3d Cir. 1992). It is for this reason that a judge "*shall* disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a) (emphasis added). Likewise, a judge shall disqualify himself "[w]here he has a personal bias or prejudice concerning a party." *Id.* § 455(b)(1). Importantly, the test for recusal under Section 455(a) does not turn on whether the judge believes he can act impartially, but whether "a reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned." *In re Kensington Int'l, Ltd.*, 368 F.3d 289, 301 (3d Cir. 2004).

**A.    Whether a judge's *sua sponte* public referral of civil counsel for criminal investigation after counsel seeks his recusal demonstrates bias warranting recusal?**

It is difficult to conceive of a clearer-cut indication of bias than the district court's decision to publicly refer Petitioners to the DOJ shortly after Petitioners sought his recusal. The timing and circumstance of the Criminal Referral reflect that

6

it is an act of retaliation against Petitioners for seeking recusal based on the appearance of bias. The district judge justified his actions by invoking his perceived "duty to notify the proper authorities if he felt a crime was being committed in his courtroom." (Appx188). Yet even if that justification held some water, it does not address why the court believed it necessary (or appropriate) to air those suspicions publicly. Nor does it explain why the court sat on this perceived "duty" for years, deciding it was obligated to act only *after* Petitioners had the temerity to seek recusal. The Criminal Referral evinces not only the district judge's personal bias, but also a disregard for his plain duty to disqualify himself under Section 455.

Two days after issuing the Criminal Referral, the court denied the Motion for Recusal, again refusing to address its *ex parte* communications with SDM Hangley head on. Rather than giving Petitioners' concerns their due, the court summarily labeled the *ex parte* communications "proper and necessary," and then pointed the finger back at Petitioners—faulting them for failing to describe the substance of the communications (to which they were neither privy nor a party) and dismissing their arguments as merely demonstrating their "dislike" for the court's rulings. (Appx188).

These objective indicators of the district court's animus are compounded by its disregard for settled precedent and due process principles in its rush to publicly shame Petitioners. As Petitioners reminded the district court, (Appx276-289), this

Court has long held that because of the drastic effect sanctions can have upon an attorney's career, procedural due process entitles an attorney facing sanctions to both "notice and an opportunity to be heard." *See Simmerman v. Corino*, 27 F.3d 58, 64 (3d Cir. 1994) (quoting *Eash v. Riggins Trucking, Inc.*, 757 F.2d 557, 570 (3d Cir. 1985)). General observations do not suffice; attorneys must receive "particularized notice" of instances of purportedly sanctionable conduct, the authority upon which sanctions are to be levied, and the specific sanction being considered. *See id.* at 65; *O.R. v. Hutner*, 515 F. App'x 85, 88–89 (3d Cir. 2013); *see also In re Tutu Wells Contamination Litig.*, 120 F.3d 368, 379 (3d Cir. 1997) (notice required not only "as to the legal rule upon which sanctions were based," but also "as to the form of the contemplated sanction")), *overruled on other grounds by Comuso v. Nat'l R.R. Passenger Corp.*, 267 F.3d 331, 339 (3d Cir. 2001).

The district court did not provide—and still has not provided—Petitioners with the particularized notice that due process requires. Rather, the court seemingly has endeavored to circumvent that notice process via the Criminal Referral, a document that condemns Petitioners with the vaguest of accusations.[2] Yet even that

---

[2] Indeed, given its public castigation of counsel and the blanket adoption of SDM Hangley's findings, the Criminal Referral arguably constitutes a sanction without calling itself one—compounding the due process problems even further. *Cf., e.g., Adams v. Ford Motor Co.*, 653 F.3d 299, 305 (3d Cir. 2011) (judicial finding of attorney misconduct and referral of counsel to attorney disciplinary board, even if unaccompanied by formal reprimand or imposition of monetary penalties, "constitutes a 'sanction'").

end-run around procedural due process remains problematic, as notice and an opportunity to be heard should have been provided *before* the public referral was made. *See, e.g.*, *In re: Terrorist Attacks on September 11, 2001*, No. 03-MDL-1570, 2023 WL 4561766, at *7 (S.D.N.Y. July 17, 2023). This sidestepping of rules designed to constrain judicial discretion and preserve constitutional rights provides additional evidence that the court's judgment is being guided by something other than the law itself.

Although "[a] judge…has a duty to take all lawful measures reasonably necessary to prevent the occurrence of a crime in his courtroom," *Martinez*, 771 F.2d at 435, this duty does not contemplate blending judicial and prosecutorial roles. Nor does it contemplate a judge issuing a public statement regarding a criminal referral, particularly when the subjects referred are attorneys appearing before the judge in active civil cases and had just sought his recusal. The only ostensible purpose for making such a statement is to publicly excoriate and embarrass Petitioners—to retaliate. The district judge has now announced to plaintiffs, defendants, Petitioners' non-party clients and potential clients, and the public at large that he believes Petitioners have engaged in criminal activity relative to the underlying civil proceeding.

Unlike an instance meriting a criminal contempt order, which is used to punish "retrospectively for a completed act of disobedience," *United States v. Donziger*, 38

F.4th 290, 305 (2d Cir. 2022), Petitioners have not disobeyed the district court.  The court has not *adjudicated* them in contempt nor adjudicated them under a theory of liability or as having violated any governing authority.  Petitioners sit at the court's mercy, waiting to learn whether civil sanctions recommended in October 2023 will be imposed, what those sanctions will be, and on what authority they will purport to lie; and it is during this period of limbo that Petitioners discovered, along with the rest of the world, that the district court referred them to the DOJ.

These circumstances suggest a great deal more than the ordinary rough-and-tumble of litigation; they raise the specter of actual judicial bias.  But whether the court is in fact animated by bias or merely appears to be, the distinction is without a difference.  After all that has transpired, it is difficult to imagine how Petitioners, their clients, or any reasonable observer could maintain confidence that the playing field remains level.  The district court's actions, in Petitioners' view, have created an untenable scenario, flouting fundamental principles of our system of justice and raising serious questions that the Panel's denial of the Petition for Mandamus leaves unanswered.  At minimum, rehearing is needed to answer these questions for the benefit not only of Petitioners, but also, and more importantly, their clients, the bar, and the public.

**B.** **Whether a judge's extensive, unauthorized *ex parte* communication with a special discovery master creates an appearance of bias warranting recusal?**

Rehearing *en banc* is also necessary to delineate the scope of permissible, substantive *ex parte* communications between a judge and his special master, when the judge owes *de novo* review to matters assigned to the master; and to determine whether the court should have recused itself due to the appearance of bias.

Rule 53(b)(2)(B) expressly provides that an order appointing a special master must state "the circumstances, if any, in which the master may communicate *ex parte* with the court or a party." Fed. R. Civ. P. 53(b)(2)(B). The Advisory Committee has long cautioned courts and their special masters to avoid unauthorized *ex parte* communications. *Id.*, advisory committee notes to 2003 amendments. And the Code of Conduct that binds federal judges instructs that a judge "should not initiate, permit, or consider ex parte communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers." Code of Conduct for U.S. Judges, Canon 3(A)(4).

Independent decision-making without influence or bias is the cornerstone of our American civil justice system. Both the Code of Conduct and Rule 53 recognize that, without appropriate restrictions, *ex parte* communications can destroy the appearance of impartial justice and, to that end, they instruct judges and masters to avoid *ex parte* communications on any factual or legal issue that will be the subject

of judicial review.  *See* Fed. R. Civ. P. 53 advisory committee notes to 2003 amendments; Code of Conduct for U.S. Judges, Canon 3(A)(4).

Here, the Appointment Order identified just three permissible types of *ex parte* communications: communications concerning procedural matters; communications to assist the court's understanding of complex discovery matters; and communications for any other reason reasonably necessary to the fulfillment of his duties.  (Appx189).

As memorialized in his billing records, SDM Hangley communicated *ex parte* with the court on at least 146 occasions throughout the course of his appointment. With few exceptions, SDM Hangley's time entries consist of general, perfunctory references that inform simply that an *ex parte* communication occurred.  Moreover, SDM Hangley documented certain communications with the district court in block entries that describe other tasks.  This practice makes it impossible to parse how much of the recorded time involved communications with the court as opposed to activities such as research and drafting.  Careful scrutiny of the billing records nonetheless supports certain conclusions.

As to the first category of *ex parte* communications, SDM Hangley took care to note when communications with the court involved procedural matters.  *See, e.g.*, (Appx240 (September 5, 2017: "discuss hearing logistics with the Court and Staff

(.40)")).  It is therefore reasonable to conclude that communications not described as procedural concerned matters of a different nature.

The second category of *ex parte* communications—complex discovery issues—was largely rendered moot by December 4, 2014, when SDM Hangley issued an R&R regarding discovery sanctions.  *See Johnson v. SmithKline Beecham Corp.*, 2:11-cv-05782-PD, ECF 414.  The few minor issues that arose thereafter were resolved at the latest by May 2015.  *See id.*, ECF 508.

All that remains is the third category—communications for any other reason reasonably necessary to fulfillment of SDM Hangley's duties.  While this language indisputably is broad, it cannot be read to create a "catch-all" provision justifying any and all *ex parte* communications between the court and SDM Hangley.  Were it otherwise, Rule 53's requirement that the court clearly state the circumstances under which disfavored *ex parte* communications are permitted would be stripped of all meaning.

SDM Hangley's fact-finding duties concluded in May 2021.  In the two-plus years between then and when he issued the R&R in October 2023, there is virtually nothing he and the court could have been discussing—other than his work on the R&R.  There were simply no other matters pending before him.  Nevertheless, of the 48.60 hours SDM Hangley billed in 2023, 32.90 hours correspond to time entries that reference *ex parte* communications with the court.  *See* (Appx220).

SDM Hangley and the court engaged in no fewer than 22 *ex parte* communications when the only task before him was preparation of the R&R. (Appx219-220). The timing and volume of these communications alone creates the appearance that the court's ability to conduct an impartial *de novo* review of the R&R was compromised. But if timing and volume were not enough, the time entries speak for themselves—many of them reveal that SDM Hangley communicated with the court on the same dates he was engaged in research, drafting, or other matters related to preparing the R&R. *See, e.g.*, (Appx220 (12/21/22 entry denoting "Research and telephone with the court."); *id.* (12/22/22 entry denoting "Research and discussion with Judge Diamond."); *id.* (2/28/23 entry denoting "Drafting and telephone with the court."); *id.* (6/2/23 entry denoting "Discuss case questions with the court. Review testimony.")).

This record strongly suggests that the court and SDM Hangley engaged in a collaborative review, culminating in issuance of the R&R. The court's summary and improper adoption of SDM Hangley's factual findings, with no consideration of or reference to Petitioners' refutation of those findings, reinforces that suggestion. And despite having repeatedly been invited to assuage the concerns this record has created, the district court has declined to do so. Rule 53 mandates independent, *de novo* review of SDM Hangley's recommendation of civil sanctions, and that is not

14

possible on this record. An appearance of bias warranting recusal therefore exists, and, for this additional reason, rehearing is necessary.

## II.    **The importance of these questions extends beyond Petitioners and the case at bar.**

The district court's actions are not simply prejudicial to Petitioners and the plaintiffs they continue to represent before that court. Those actions dangerously blur the line between the separation of two branches of power—judicial and executive—and they grievously undermine the public's confidence in a neutral judiciary. "[O]ur Constitution's separation of powers exists in no small measure to keep courts from becoming partisans in the cases before them." *Donziger v. United States*, 598 U.S. ----, 143 S. Ct. 868, 870 (2023) (Gorsuch and Kavanaugh, JJ., dissenting from denial of certiorari) ("In this country, judges have no more power to initiate a prosecution of those who come before them than prosecutors have to sit in judgment of those they charge."); *see also In re United States*, 441 F.3d 44, 67 (1st Cir. 2006) ("A judge's investigation of a prosecutor's office under the label of government misconduct as to the grand jury is not just a ruling in the ordinary course. It poses the risk that the line will be crossed 'between executive and judicial roles, and between the formulation and evaluation of positions in litigation.'" (internal quotation marks omitted)).

For more than two years, the district court has declined to rule on SDM Hangley's sanctions recommendation. In the interim, the court has attempted to

enlist the DOJ and law enforcement powers entrusted by the Constitution to the Executive branch to supplement the investigation SDM Hangley undertook as an adjunct of the judiciary—and publicly upbraided Petitioners in the process. All the while, Petitioners and their clients are forced to proceed before a court that has revealed itself to be (or at minimum, reasonably appears to be) harboring *and acting upon* very real animus toward Petitioners. Whether and under what circumstances such a scenario must be tolerated is a question of exceptional importance, and rehearing is the only vehicle available for Petitioners and their clients to receive an answer to that question.

## CONCLUSION

The Panel's single-sentence denial of the Petition for Mandamus deprives Petitioners, their clients, the judiciary, and the public of necessary guidance on how a district judge should conduct himself with his special master so as to avoid the appearance of bias; and when (and, if so, how) a judge should proceed upon suggestion of criminal activity when the accused are civil attorneys who are both appearing before the judge and actively seeking his recusal. These are matters of first impression and exceptional importance; not simply for the plaintiffs, who are entitled to an impartial arbiter and whose attorneys have now been publicly accused of criminal wrongdoing; and not simply for Petitioners, whose reputation,

livelihood, and standing in the community hang in the balance[3]; but for the public and its expectation of and entitlement to a neutral judiciary.

Accordingly, Petitioners request that the Court grant this Petition for Panel Rehearing or for Rehearing *En Banc* and rehear the Petition for Mandamus to provide clear, public guidance on the exceptionally significant issues raised therein.

---

[3] On January 13, 2026, Robert B. Carey, Esquire, submitted an affidavit in support of the Petition for Mandamus in which he attested to the considerable and ongoing reputational and professional harm that Petitioners are suffering because of the Criminal Referral.  (Doc. 13).

Date: February 3, 2026

Respectfully submitted,

**SAXTON & STUMP**

*s/ Christopher C. Conner*
Christopher C. Conner (PA I.D. 36407)
Stefanie Pitcavage Mekilo (PA I.D. 312720)
4250 Crums Mill Rd., Ste. 201
Harrisburg, PA 17112
Telephone: (717) 216-5505
cconner@saxtonstump.com
smekilo@saxtonstump.com

Gaetan J. Alfano (PA I.D. 32971)
Peter St. Tienne Wolff (PA I.D. 208433)
PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI LLP
1818 Market Street, Suite 3402
Philadelphia, PA 19102
Telephone: (215) 320-6200
gja@pietragallo.com
PSW@pietragallo.com

Keith Beauchamp (AZ I.D. 12434)
Malvika A. Sinha (AZ I.D.038046)
COPPERSMITH BROCKELMAN PLC
2800 North Central Avenue, Suite 1900
Phoenix, AZ 85004
Telephone: (602) 381-5490
kbeauchamp@cblawyers.com
msinha@cblawyers.com

*Attorneys for Petitioners*

## <u>CERTIFICATES OF COMPLIANCE</u>

I, Christopher C. Conner, Esquire, certify as follows:

1.      This Petition for Panel Rehearing or for Rehearing *En Banc* complies with Fed. R. App. P. 40(d)(3)(A) because it contains 3,891 words, excluding the exempted portions.

2.      This Petition for Panel Rehearing or for Rehearing *En Banc* complies with the typeface requirements of the Third Circuit L.A.R. 32.1(c) and Fed. R. App. P. 32(a)(5) & (6) because it was prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

3.      The text of each of the electronic and hard copy forms, if any, of this Petition for Panel Rehearing or for Rehearing *En Banc* are identical.

4.      A virus detection program, Microsoft Defender for Endpoint P1, version 10.8797.25857.1000, was run on the electronic version of this Petition and no viruses were detected.

5.      Pursuant to 28 U.S.C. § 1746, I certify that under penalty of perjury that the foregoing is true and correct.


Dated: February 3, 2026                    s/  Christopher C. Conner

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 3, 2026, copies of the foregoing **Petition for Panel Rehearing or for Rehearing *En Banc*** were served via email upon all counsel of record and parties proceeding pro se in this matter at the following email addresses:

MICHAEL T. SCOTT    mikescottlaw@outlook.com, dford@reedsmith.com, jhenry@reedsmith.com, mscott@reedsmith.com

GAETAN ALFANO    gja@pietragallo.com, pk@pietragallo.com

ROBERT E. WELSH, JR rewelsh@welshrecker.com, cmcparland@welshrecker.com, rwalk@welshrecker.com

WILLIAM T. HANGLEY whangley@hangley.com, ccm@HANGLEY.COM, ecffilings@hangley.com, jdb@hangley.com

ERIC L. ALEXANDER ealexander@reedsmith.com

ARTHUR DONATO, JR art@artdonato.com, nancymcl@artdonato.com

RACHEL BETH WEIL rweil@reedsmith.com, rachel-weil-8451@ecf.pacerpro.com, reed-smith-2312@ecf.pacerpro.com

STEPHEN J. MCCONNELL smcconnell@reedsmith.com, reed-smith-2312@ecf.pacerpro.com, rgilson@reedsmith.com, stephen-mcconnell-1593@ecf.pacerpro.com

LISA L. SMITH Lsmith@phillipslytle.com, jgarcia@phillipslytle.com, lweber@phillipslytle.com

THOMAS S. WISWALL twiswall@phillipslytle.com, cpalumbo@phillipslytle.com, ecfphillips@phillipslytle.com, jgroat@phillipslytle.com

CINDY K. BENNES ckbennes@phillipslytle.com, dbuckingham@phillipslytle.com, ecfphillips@phillipslytle.com, jcarella@phillipslytle.com

LAURENCE F. PULGRAM lpulgram@fenwick.com, dwalls-stewart@fenwick.com, laurence-pulgram-6364@ecf.pacerpro.com, tgregorian@fenwick.com

Sonja Stenger Weissman sweissman@reedsmith.com

MARTHA M. HARRIS mharris@phillipslytle.com

TAMAR P. HALPERN thalpern@phillipslytle.com, hkosicki@phillipslytle.com, lweber@phillipslytle.com

ELIEZER GRANEK egranek@eckertseamans.com, lspencer@eckertseamans.com

THOMAS J. SHEEHAN tsheehan@phillipslytle.com

TODD RICHARD GREGORIAN tgregorian@fenwick.com, sgray@fenwick.com

FARAH TABIBKHOEI ftabibkhoei@reedsmith.com, vparedes@reedsmith.com

RAYMOND A. CARDOZO rcardozo@reedsmith.com

CARY L. RICE crice@hangley.com, kem@hangley.com

CYNTHIA ALBRACHT-CROGAN ccrogan@cdqlaw.com, ccohoat@cdqlaw.com, vsierra@cdqlaw.com

DAVID C. WEINER daveweiner11@gmail.com

CAROLYN SAMPSON cafsampson@gmail.com

JOSE NAVAMUEL josenavamue@gmail.com

MARY SELLS Sweets77@outlook.com

TERRIE BOLTON tmixon922@gmail.com

DARREN GRIGGS dgriggs622@gmail.com

JOHN MARSHALL jmarshall.marshall9@gmail.com

MARK HARRELLSON harrelson40@bellsouth.net

On this same date, a copy of the **Petition for Panel Rehearing or for Rehearing *En Banc*** was served via email upon Respondent U.S. District Court for the Eastern District of Pennsylvania:

> The Honorable Paul S. Diamond
> United States District Court, Eastern District of Pennsylvania
> 601 Market Street, Room 14614
> Philadelphia, PA 19106-1773
> Chambers_Judge_Paul_S_Diamond@paed.uscourts.gov

Dated: February 3, 2026                    s/  Christopher C. Conner